## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                  Cr. No. 21-557 JCH

JAMES HILL,

       Defendants.

## MEMORANDUM OPINION AND ORDER

This case is before the Court on *Defendant's Motion to Suppress Statements and Physical Evidence* [Doc. 36], filed February 17, 2022. The Government filed its amended response [Doc. 41] on March 4, 2022, and Defendant filed his reply [Doc. 45] on April 7, 2022. On May 3, 2022, the Court held an evidentiary hearing on the motion, which Defendant attended and at which he was represented by counsel. After hearing the evidence, considering the arguments of counsel in the briefs, and analyzing the relevant legal authorities and precedents, the Court concludes that the motion should be denied.

## FACTUAL BACKGROUND

For the purpose of ruling on this motion to suppress only, the Court finds the facts to be as follows.

On April 7, 2021, Defendant James Hill was traveling on an eastbound Greyhound bus that made its regularly scheduled stop in Albuquerque. Transcript of May 3, 2022 hearing ("Tr.") at 10-11. Jarrell Perry, a Special Agent with the Drug Enforcement Agency ("DEA"), was at the Albuquerque Greyhound station to meet the bus. Tr. at 10. Perry has worked in drug interdiction

for over 22 years and has training and experience in identifying many types of drugs. Tr. at 22-23. Perry, who was wearing casual, plain clothes, was accompanied by fellow DEA Special Agents Caleb Brown and Joshua Belida. Tr. at 10-11, 80. Perry carried a firearm on his right side, but it was hidden beneath his shirt. Tr. at 38-39. Perry also had an audio recording device under his shirt, which he used to record his encounters on the bus. Tr. at 40.

After all the passengers disembarked and the bus had been serviced, Perry boarded the bus along with Brown.[1] Tr. at 11. Belida stayed outside the bus. Id. When the passengers got back on the bus, Perry began talking to them. Id. After talking to a number of other passengers and asking for consent to search their bags, Perry approached Defendant James Hill, who was sitting in a left-side window seat near the middle of the bus. Tr. at 12-13. Perry greeted Hill and displayed his DEA badge, identified himself as a police officer who was checking the bus, and asked for permission to speak with him. Tr. at 13; Gov't Ex. 1 (recording of encounter). Hill agreed to speak with Perry and remained in his seat. Tr. at 13. In response to Perry's questions, Hill stated that he was traveling from Phoenix, Arizona to Pittsburgh, Pennsylvania. Id.; Gov't Ex. 1. Perry looked at Hill's ticket and identification, confirming his identity and travel route. Tr. at 14, 48. He then handed back Hill's ticket and identification. Id.

Then, Perry asked Hill if he had luggage with him. Tr. at 14; Gov't Ex. 1. Hill said that the two bags next to him, along with a checked bag in the compartment under the bus, were his. Id. Perry asked Hill if he had any weapons or anything illegal with him. Hill said that he did not. Tr. at 48-49; Gov't Ex. 1. Then, Perry asked permission to search the bags for "contraband," and Hill

---

[1] Other than Perry's testimony that Brown had boarded the bus and was at the front, Tr. at 20, there is no evidence as to what Brown was doing while Perry talked to passengers. There is also no evidence that Hill was aware of Brown's presence or even that he was a law enforcement officer. Due to the lack of evidence on the subject, the Court makes no finding.

agreed. Tr. at 14; Gov't Ex. 1. Perry searched both bags and found no contraband. Tr. at 14. Next, Perry asked Hill for permission to search his jacket for contraband. Tr. at 14; Gov't Ex. 1. Hill did not answer verbally, but he handed the jacket to Perry, who searched it and again found no contraband. Tr. at 14, 94. Finally, Perry asked Hill if he had "anything" on his person. Hill said, "No," and then Perry asked for permission to perform a pat down search on Hill to look for contraband. Id.; Tr. at 50. Again, Hill did not answer verbally. Instead, he nodded his head up and down and raised both arms above his head. Tr. at 14-15, 21. However, Perry could not perform the pat down while Hill was seated by the window, so he asked Hill if he could stand up and move into the aisle. Tr. at 15, 21; Gov't Ex. 1. Once again, Hill did not respond verbally, but he did stand and step into the aisle, and he raised his hands above his head. Tr. at 15. Perry told Hill that he could lower his arms and then began the pat down. Tr. at 15. At no point did Hill indicate, either verbally or non-verbally, that he did not consent to the search. Tr. at 21-22. Perry asked Hill to lower his arms and then conducted the pat down search. Tr. at 15.

Using both hands, Perry started at Hill's shoulders, Tr. at 53, first patting down his chest area, then his back and abdomen. Tr. at 15-16. From the waistline, Perry worked his way from the top of each of Hill's hip and upper thigh down the length of his leg to his ankle area, and then back up to the top of the leg. Tr. at 16-17, 84. Perry felt the upper inside of each of Hill's legs, as well as the front and sides of both legs and hips. Id. He did not touch Hill's genitalia. Id. at 16-17. In doing the pat down, Perry felt a hard bundle under Hill's jeans in the area of the left front pocket near the outer thigh. Tr. at 18-19. Perry grabbed it with his fingers, Tr. at 55, and in doing so felt a crunching sensation.[2] Tr. at 19. From his experience doing pat-down searches, Perry suspected

---

[2] When asked for what length of time he grabbed the object in Hill's left front pocket area, Perry was vague: "I can't tell you exact time. I felt the bundle and squeezed it. It was crunchy. I don't

3

that the bundle contained crystal methamphetamine. Id. at 19-20 However, he did not ask Hill what was in the bundle or ask for permission to check it further. Tr. at 56.

At this point, Perry asked Agent Brown to join him, and he placed Hill under arrest by placing handcuffs on him. Tr. at 20. Brown stayed with Hill while Perry continued speaking with other passengers. Tr. at 24, 60. Perry asked to search the bags of some of the passengers he spoke with, though he did not ask permission to pat any of them down. Gov't Ex. 1. Eventually, Perry and Brown gathered up Hill's belongings and took him to a private area in the bus station. Tr. at 24. There, Perry loosened Hill's pants and saw that he was wearing a pair of shorts underneath. Tr. at 24. In the left front pocket of those shorts, Perry found and partially removed a hard, clear, plastic-wrapped bundle containing a crunchy, crystalline substance that he recognized and believed to be crystal methamphetamine. Tr. .at 24, 61-62. In the right front pocket of the shorts he found a loaded firearm. Tr. at 25, 30. Perry transported Hill to the Albuquerque office of the DEA for processing. There, the crunchy, crystalline substance found in Hill's left front pocket field tested positive for methamphetamine. Tr. at 25.

During processing, Perry read Hill his Miranda rights. Tr. at 31. Afterwards, Hill made self-incriminating statements.

## DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures." U.S. Const. amend. IV. Before assessing whether the actions of law enforcement constituted an unreasonable seizure, we first ask whether a seizure occurred.

---

know if it was seconds or maybe not even one.  I don't even know how long it was." Tr. at 55.
From this testimony and Perry's demeanor when giving it, the Court infers that Perry's
manipulation of the object was brief.

There are three types of police-citizen encounters: (1) a consensual encounter, which does not constitute a seizure and therefore does not implicate the Fourth Amendment; (2) an investigative detention, which must be justified by reasonable suspicion of criminal activity; and (3) an arrest, which must be justified by probable cause. *See United States v. Roberson*, 864 F.3d 1118, 1121 (10th Cir. 2017); *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017).

"The Fourth Amendment does not proscribe all contact between the police and citizens." *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984). For instance, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion)). These are referred to as consensual encounters which do not implicate the Fourth Amendment. *See United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006). It is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [that a court] may conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

## I.    Voluntary Consent to Search

### A.    <u>Legal Standard</u>

As noted above, the Fourth Amendment prohibits warrantless searches. However, certain exceptions exist. "Voluntary consent to search is one such exception." *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012) (quotation omitted). "The government bears the burden of showing the consent was voluntary by (1) proffering clear and positive testimony that consent was unequivocal and specific and freely given and (2) proving that this consent was given without implied or express duress or coercion." *United States v. Salas*, 756 F.3d 1196, 1203 (10th Cir.

2014) (quotation omitted); *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992). Consent may be either express or implied.

"To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). Rather, a defendant my indicate consent may through gestures other non-verbal cues, "so long as they are sufficiently comprehensible to a reasonable officer." *Id*. at 789-90 (citing *United States v. Benitez*, 899 F.2d 995, 998-99 (10th Cir. 1990); *United States v. Gordon*, 173 F.3d 761, 765-66 (10th Cir. 1999)). Nor is an officer required to inform a defendant explicitly that he is free to go before requesting permission to search. *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996).

The second prong, requiring that the consent be free of coercion, turns on whether a reasonable person would believe he was free to leave or to deny the officer's request to search. In determining whether an encounter between a police officer and a citizen is consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). "[T]he test allows officers to make inquiries so long as they don't throw their official weight around unduly." *United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990). This inquiry is objective: "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." *United States v. Laboy*, 979 F.2d 795, 799 (10th Cir. 1992).

There are no *per se* rules that govern this inquiry; "[r]ather, every case turns on the totality of the circumstances presented." *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999)

(quoting *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc)). However, it must be said that when an encounter with police occurs on a bus or train, the relevant inquiry is not whether a reasonable passenger would feel free to leave the bus or train, but rather, whether a "reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436.

The Tenth Circuit has enumerated a list of factors to be considered in determining whether a reasonable person would feel free to terminate his encounter with the police. Although the list is not exhaustive, it includes:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*United States v. Lopez*, 443 F.3d at 1284 (quoting *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005)). Other relevant considerations bear on whether a consensual encounter in transformed into a seizure, and they include whether there is physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the person giving consent, and the number of officers on the scene. *Jones,* 701 F.3d at 1318 (quotation omitted). While "no single factor is dispositive, the 'strong presence of two or three factors' may be sufficient to support the conclusion a seizure occurred." *Lopez*, 443 F.3d at 1284-85 (quoting *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006)).

B.      **Analysis**

In his motion to suppress, Hill asserts that he did not consent to the pat down search by silently nodding his head. In fact, at the hearing Hill testified that he was shocked when Perry asked for permission to conduct the pat-down and that he said, "No," but that he said it quietly such that it is not audible on the recording. He also argues that the search of his belongings and the pat down search of his body was not consensual because no reasonable person in that situation would have believed that he had the right to refuse. Hill argues that because Perry did not inform him that he was a DEA agent searching for narcotics and instead said merely that he was a police officer checking the bus, Hill could not determine whether Perry was conducting the type of required, routine safety check that has been common in domestic travel or if he was investigating an imminent threat to his own and other passengers' safety. He argues that no reasonable passenger under the circumstances would feel he could ask Perry to clarify his obligations due to fear that he would jeopardize his ability to continue his travels. Hill also points out that Perry did not inform him of his right to decline to speak with Perry or his right to decline the search. Finally, Hill argues that the fact that he is a Black man reasonably contributed to his conclusion that he was required to cooperate with Perry.

Hill argues in the alternative that any consent that may have been given was not voluntary because it was not clear and unequivocal. Hill argues that no reasonable officer in Perry's position could have believed that Hill freely gave unequivocal, specific consent to perform the pat down.

Finally, in his reply brief Hill cites a variety of cases regarding the circumstances that can change a consensual encounter into a seizure. Although Hill stops short of arguing that he was seized during the initial encounter with Perry, he contends that there are elements to the encounter—the proximity of a large group of strangers, the fact that Perry singled out Hill in a

8

manner he had not engaged with any other passenger (by asking to perform a pat down, for example)—that make the circumstances more coercive. In light of those circumstances, he contends that under the totality of the circumstances test, Perry's failure to advise Hill of his right to decline to answer questions or decline the pat down weighs against a finding of voluntary consent.

        1.    *Consent was unequivocal and specific*

    The Court concludes that Hill's consent to the pat-down search was unequivocal and specific. First, it was specific because of the context of the encounter. Perry first asked Hill if he had weapons or anything illegal, and when Hill said no, Perry immediately followed up with a request for consent to search Hill's bags for "contraband." In light of this interaction, a reasonable person in Hill's position would assume that "contraband" included both weapons and illegal items, which in turn would include illegal narcotics. A short time later, Perry asked Hill if he could perform a pat-down search of his person for contraband. Thus, a reasonable person in Hill's position would understand that he was being asked for permission to be patted down for weapons, drugs, and other illegal items. Both the nature and purpose of the search were made explicit and specific. Hill clearly assented not only by nodding his head, but also by physically moving his body to facilitate the search. Hill's consent was unequivocal because when Perry asked for consent to perform the pat-down, Hill not only nodded his head[3], but also raised his arms to assist in the pat-down. Hill reaffirmed this consent when he stood up in the aisle when asked to do so by Perry

---

[3] Hill testified that he did not nod his head, but rather was shocked and said "no" in a soft voice that did not make it onto the recording. Tr. at 82-83. However, the Court finds Perry's testimony more credible on this point. First, Perry's testimony is consistent with the audio recording. Second, Hill damaged his credibility after his arrest, when he told Perry that he had found the drugs on the bus and was keeping them with the intent of turning them into authorities at a later time—a story that he admitted was false.

and then raised his hands above his head. A reasonable officer would comprehend these actions to indicate consent to a pat-down.

Hill relies on *United States v. Muse*, 428 F. Supp. 3d 1186 (D.N.M. 2019) (Vazquez, J.), but that case is distinguishable for two reasons. In *Muse*, which also involved a search by Perry on a bus, the court found an inconsistency between Perry's testimony that the passenger said, "Yeah" in response to Perry's request to perform a pat-down search, and the audiotape of the encounter, which recorded no audible response. Because of the lack of audible response on the audio tape, the *Muse* court found Perry's testimony to be unreliable. 428 F. Supp.3d at 1196. However, in this case, Perry has testified that Hill nodded and raised his arms when Perry asked for permission to do the pat-down search but did not answer verbally. This is not only consistent with the audio tape, but also consistent with Hill's prior non-verbal response to Perry's request to search his jacket. Thus, the Court has concluded that Perry's testimony is this case is credible. Second, the *Muse* court found that Perry could not reasonably have believed that the passenger gave unequivocal and specific consent to the search because he was distracted by his cell phone and headphones when Perry spoke to him. *Id*. at 1196-97. In contrast, in this case there is no evidence to suggest that Hill was not giving Perry his full attention during their interaction.

2.    *Consent was freely given without duress or coercion*

After considering the totality of the circumstances surrounding the encounter between Hill and Perry, the Court concludes that Hill gave his consent freely. Perry's conduct would have communicated to a reasonable, innocent person that he was at liberty to ignore the police presence and go about his business. Perry spoke to Hill (and all the other passengers) in a calm, nonthreatening, almost friendly tone. He asked Hill and other passengers for permission to speak to them and to search their bags—he did not make demands. Further, Perry did not touch Hill until

10

after he obtained consent to perform the pat-down search. Perry did not employ physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone with Hill or anyone else on the bus before obtaining consent. Perry was dressed in plain clothes. He did not display his weapon, but kept it hidden under his shirt. In his testimony, Hill did not suggest that he was even aware of the presence of Brown and Belida, much less that they contributed to his perception that he had no choice but to agree to a pat-down. Thus, the presence of multiple agents appears to be a non-factor. At the time Perry asked for consent to perform the pat-down, he did not have possession of Hill's ticket or his identification. Hill was not cornered alone and out of view of others, but rather in a public space—a factor that also weighs in favor of voluntariness. Both on the recording and during his testimony at the hearing, Hill appeared and sounded to be of normal physical and mental condition and capacity and therefore capable of giving valid consent. All of these facts weigh in favor of finding that Hill gave his consent freely.

As Hill points out, Perry did not tell Hill that he was free to leave or to decline the search of his bags or of his person. Tr. at 51-52. Whether an officer informs someone of his right to refuse consent is a factor to consider in determining whether consent given was voluntary under the totality of the circumstances, though not a determinative one. On the other hand, the Supreme Court has held that an officer is not *required* to inform a defendant of his right to refuse. *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996). Informing Hill of his right to refuse the pat down would have contributed to the voluntariness of consent. However, the Court finds that under the totality of the circumstances Perry's failure to inform Hill of his right to refuse is outweighed by all the other factors which suggest that Hill voluntarily consented to the pat-down.

The Court is also unpersuaded that Hill's valid consent was vitiated by the fact that Perry did not inform him that he was a DEA agent searching for narcotics. According to Hill, Perry

misled him when he said he was a police officer checking the bus and again when Perry said he was searching for contraband. Hill argues that he could not determine whether Perry was conducting the type of required, routine safety check that has been common in domestic travel or if he was investigating an imminent threat to his own and other passengers' safety. However, Hill's argument is undermined by the nature of the language Perry employed during their encounter. First, it was clear that these searches were optional because Perry asked permission to conduct them. If this was a "required, routine safety check" as Hill suggests (such as those conducted on passengers and their luggage at airports), Perry would not have needed to ask the passengers' permission. Second, Perry let Hill know that he was looking for more than just weapons. When Perry first asked Hill about his luggage, he asked if Hill had "weapons *or anything illegal*" with him. Then Perry immediately followed up with a request to search the bags for "contraband." After that, each time Perry asked Hill for consent, he asked if he could search for "contraband." This language makes it clear that Perry was looking not only for weapons, but also for other illegal items. Illegal narcotics clearly fit within the definition of "contraband." Perry did not mislead Hill as to the nature and purpose of his inquiries, and Hill's consent was valid.

II.     **Scope of Consent**

    A.     <u>**Legal Standard**</u>

    A consensual search may not exceed the scope of the consent. The scope of the consent is measured by a test of "'objective' reasonableness": it depends on how broadly a reasonable observer would have interpreted the consent under the circumstances. *See Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991).

    The scope of consent "is defined by the search's express object and is limited by the breadth of the consent given." *United States v. Freeman*, No. 01-CR-496 JP, 2002 WL 35650115, at *4

(D.N.M. Feb. 13, 2002) (citing *United States v. Elliott*, 107 F.3d 810, 814-15 (10th Cir. 1997)).

Courts apply an objective reasonableness test that asks what "the typical reasonable person [would]

have understood by the exchange between the officer and the suspect," *Elliott*, 107 F.3d at 815

(citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)), and then make a factual determination about

whether the search exceeded the scope of consent based on the totality of the circumstances, *see*

*United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990). That said, "a defendant's failure to

limit the scope of a general authorization to search ... is an indication the search was within the

scope of consent." *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999). Similarly, a

person's "failure to object when the search exceeds what he later claims was a more limited

consent[ ] is an indication the search was within the scope of consent," when the "defendant

initially gave a general authorization to search." *United States v. Wald*, 216 F.3d 1222, 1228 (10th

Cir. 2000) (internal quotation marks omitted).

**B.     Analysis**

Hill argues that even if he did voluntarily consent to a pat down search of his person, a

reasonable person in Hill's position would not have expected to be patted down in the "crotch," or

"groin area." Hill further contends that Perry exceeded the scope of any consent by using his

fingers to manipulate the package he felt in Hill's left front pocket area, when a "pat down" is

usually performed with flat hands and is typically performed only to determine the presence of

weapons.

### 1.     *No Pat Down of the Crotch/Groin Area*

The Court concludes that Perry did not touch Hill in the crotch area—that is, on his genitals.

Using both hands, Perry searched Hill with both hands starting at his shoulders and moving down

his torso. When he reached Hill's legs, Perry started at the top of the thigh, where he felt some sort

of bundle in Hill's left front pants pocket area. Perry continued with both hands down to Hill's ankle, and then back up to the top of the thigh. There is no evidence in the record that Perry searched Hill's "crotch area," *see* Doc. 36 at 9, or the area of his genitals. Thus, the Court concludes that the premise of Hill's argument—that Perry searched his crotch—is false.

That said, Perry did search the area of the front pockets of Hill's pants, or the front of his hip, which the Court will refer to as his groin area. Hill argues that searches of the groin area are permitted only when doing a search for narcotics. He contends that because Perry did not tell him that Perry would be searching for drugs, Perry could not search there. However, the express purpose of this pat down was to look for "contraband," which as explained above could include weapons,drugs, or other illegal items. A pat-down in the area of a front hip pocket is reasonable when one is searching for either weapons or drugs.

Although *Terry* focused on weapons searches where officer safety considerations are paramount, *id*. at 27, 88 S.Ct. 1868, (as opposed to a consent search for contraband), the Supreme Court's reference to the scope of a search of the person is instructive. In *Terry*, the Supreme Court recognized that searching a suspect's person may consist of "a careful exploration of the outer surfaces of a person's clothing all over his or her body." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). In *Terry* the Court cited the following as an "apt description" of an officer field-search: "The officer must feel with sensitive fingers every portion of the prisoner's body. A thorough search must be made of the prisoner's arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet." *Id*. at 17 n. 13 (quoting L.L. Priar & T.F. Martin, Searching and Disarming Criminals, 45 J. Crim. L. Criminology & Police Sci. 481, 481 (1954)). Thus, a pat-down for weapons under *Terry* would certainly permit touching in the groin and upper thigh, where Perry touched Hill. Since Perry's search was for a broader purpose to include not

only weapons but also illegal drugs and other contraband, it was reasonable for him to search Hill's front pocket area around his hip and upper thigh.

Again, *Muse* is distinguishable on its facts. In *Muse*, the court concluded that the factual circumstances—which included Perry identifying himself as a police officer who was there to "check the bus [] for security"—would lead the passenger to reasonably believe that a request to search for "contraband" was a request to search for weapons. 428 F. Supp. 3d at 1197-98. However, the facts here are different in that Perry first asked Hill if he had weapons or "anything illegal," which broadened the request to items beyond weapons to include illegal narcotics. While this court believes that the natural meaning of the word "contraband" includes illegal drugs, the fact that Perry stated he was looking for "anything illegal" certainly underscored that definition.

In conclusion, Perry's pat-down search of Hill included the front of his hips and the top of his thighs where one would imagine a man's front pants pockets to be; it did not extend to Hill's crotch. A search of this area of Hill's body was within the scope of Hill's consent to be searched for contraband.

### 2. *Perry's Manipulation of the Package with His Fingers*

Next, Hill argues that Perry exceeded the scope of the consensual pat-down search by manipulating the package in his front pocket with his fingers. According to Hill, the law limits an officer to feeling a suspect's body with the flat of his hands to determine if the suspect is armed and does not permit the officer to manipulate any lumps with his fingertips. Indeed, the Supreme Court has observed that "squeezing, sliding, and otherwise manipulating" objects or areas on a suspect's person falls outside the bounds of a pat-down frisk. *Minnesota v. Dickerson*, 508 U.S. 366, 377-78 (1993) (stating that when an officer who is executing a valid search for one item seizes a different item, courts should be sensitive to the danger that officers will enlarge a specific

authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will.). In *Dickerson*, a state police officer identified a small "lump" through a suspect's nylon jacket and a cellophane wrapping and based thereon "formed the opinion" that the object was crack. *Id*. at 377. The Supreme Court noted, however, that the officer determined that the lump was contraband only after "squeezing, sliding, and otherwise manipulating the contents of the defendant's pocket." *Id*. Therefore, the plain touch doctrine did not apply because the object's contraband nature was not "immediately apparent." *Id*. at 378. Thus, when doing a pat down to look for weapons for purposes of officer safety, the officer's continued exploration of a defendant's pocket after concluding that it contained no weapon was outside the bounds of a search under *Terry*.

However, Hill's argument fails for two reasons. First, the pat-down Perry conducted was broader than the limited pat-down for officer safety described in *Terry*. To pass constitutional muster, a *Terry* frisk must be not only supported by reasonable suspicion, but also "carefully limited [to] ... the outer clothing ... in an attempt to discover weapons which might be used to assault" an officer. *Terry*, 392 U.S. at 20, 29-30. Because a *Terry* frisk is limited to the individual's outer clothing, the scope of the search is proper only if any incriminating evidence was immediately apparent during the pat-down. *See United States v. I.E.V.*, 705 F.3d 430, 440 (9th Cir. 2012). Perry's pat down of Hill was not a *Terry* frisk, however. Rather, Hill consented to a search that was broader in scope to include not just weapons, but also "contraband." Thus, the stated purpose of the pat-down search was for more than weapons or officer safety. The term "contraband" is broad. The Merriam-Webster dictionary defines contraband as "goods or merchandise whose importation, exportation, or possession is forbidden." To a reasonable English-speaking person this would include not only weapons, but also illegal narcotics and other drugs.

16

That fact is reinforced by the fact that Perry indicated that he was looking for weapons or "anything illegal." Items of this sort could be hidden in various places on a person's body, including pants pockets or in the hip or groin area.

Second, the breadth of the consent search for contraband granted Perry a little bit more leeway to probe the package he felt under Hill's pants. Although he was not free to probe the package for an extended period of time, Perry was not limited to a flat-handed pat-down for weapons. Rather, Perry could grab the package with his fingers briefly—as he did here—in order to determine whether his training and experience suggested that it was an illegal substance falling within the meaning of contraband.

## III.    Probable Cause

### A.    <u>Legal Standard</u>

An arrest must be supported by probable cause, which is a more demanding standard than the reasonable suspicion required to support an investigative stop. *See United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004). "A court will find probable cause to arrest when facts and circumstances from a reasonably trustworthy source are within the officer's knowledge and sufficiently warrant a person of reasonable caution to believe a crime has been or is being committed by the person to be arrested." *United States v. Pearson*, 203 F.3d 1243, 1268 (10th Cir. 2000). Probable cause is an objective standard. "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive. Thus, the primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *See United States v. Valenzuela*, 365 F.3d 892, 896-97 (10th Cir. 2004) (citations and internal quotations omitted). No single factor is determinative, and the circumstances must be viewed in their totality. *See id*. at

897. In determining whether probable cause to arrest existed, the Court must look not only to the facts supporting probable cause, but also to those that weigh against it. *See id*. The Government bears the burden of establishing the probable cause necessary to support the arrest. *See id.* at 902.

In addition to recognizing the consent exception to the warrant requirement, courts have adopted the "plain view" exception. The rationale behind the plain view exception is that "if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment." 508 U.S. at 375. In *Minnesota v. Dickerson*, the Supreme Court explained that the plain view doctrine "has an obvious application by analogy to cases in which officers discover contraband through the sense of touch during an otherwise lawful search." *Id*. at 375. The Court reasoned:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id*. "As in plain view situations, the seizure is constitutionally permissible because where the contraband's nature is immediately apparent, the seizure is supported by probable cause." *United States v. Yamba*, 407 F. Supp. 2d 703, 709-10 (W.D. Pa. 2006), *aff'd*, 506 F.3d 251 (3d Cir. 2007). "Regardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures." *Dickerson*, 508 U.S. at 376.

### B.     Analysis

Hill argues that Perry lacked probable cause to arrest him. Specifically, he contends that the "crunching feel of a packet in a shorts pocket under a pair of jeans was insufficient to give rise to probable cause for Hill's arrest" because it was consistent with innocent substances like food or candy. Doc. 36 at 12. He notes that the contraband nature of the bundle was not immediately apparent from the pat-down, but rather it was necessary for Perry to ascertain that it was "crunchy" by improperly probing and manipulating Hill's clothing in a way that exceeded his authority during a pat down. Hill points out that Perry did not ask him about the substance, and that in the absence of other suspicious factors it was unreasonable for Perry to conclude that there was a substantial probability that Hill had committed a crime.

In this case, Perry performed a consensual pat down for contraband, not one limited by the constraints of a *Terry* search. In doing so, Perry felt a hard bundle under Hill's jeans in the area of the left front pocket near the outer thigh and briefly grabbed it with his fingers. Perry felt a crunching sensation that his experience doing pat-down searches caused him to suspect that the bundle contained crystal methamphetamine. Many courts have upheld seizures under similar circumstances, finding that officers had probable cause to arrest based upon the "plain touch" doctrine after feeling something during a pat down that they recognize to be illegal narcotics.

For example, in *United States v. Proctor*, 148 F.3d 39 (1st Cir.1998), the Court of Appeals for the First Circuit upheld a search where the officer frisked two men he observed entering a building that was under surveillance for suspicion of narcotics activity. While conducting the pat down, the officer "touched the bulge in Proctor's jacket pocket and felt a soft, leafy substance in a glassine bag which he believed to be marijuana." *Id*. at 41. Based on this conclusion, the officer directed the defendant to empty his pockets and arrested him for possession of marijuana. The First Circuit Court upheld the search because "the district court found that Officer Campbell, upon

19

feeling the bulge, immediately recognized it as a bag containing marijuana." *Id*. at 43. In support of this factual finding, the Court noted that "Officer Campbell testified that he was consistently able to determine the feel of marijuana from conducting numerous patdowns of suspects." *Id*.

The Ninth Circuit Court upheld a similar "plain touch" seizure in *United States v. Mattarolo*, 209 F.3d 1153 (9th Cir. 2000). In *Mattarolo*, a police officer was conducting a *Terry* frisk when he felt a bulge that he thought might be a weapon. *Id*. at 1156. "He closed his thumb and forefinger around it to see whether it was hard, suggesting a possible knife. Instead of anything hard he felt little chunks in plastic bags which he immediately recognized as drugs." *Id*. at 1156. The Ninth Circuit affirmed the decision because the record indicated that the officer "did not seek to manipulate the object, but was nevertheless alerted immediately to the presence of drugs by the familiar sensation of plastic sliding against a granular substance." *Id*. at 1158. In reaching this conclusion, the Court took specific note that the officer "recognized the contents as drugs, he explained, because of the distinctive feel and his experience gained from thirty to forty pat downs in which drugs were found in people's pockets." *Id*. at 1156.

In order to establish probable cause, the officer need not be certain that the object he feels during a pat down is illegal narcotics. In *United States v. Rogers*, 129 F.3d 76 (2d Cir. 1997), the Second Circuit upheld the constitutionality of a police officer's seizure when during questioning, the defendant reached inside her coat. The officer then grabbed the coat to feel for weapons and felt a "hard object" and a "soft object" inside a paper bag. The officer was not certain that the objects were not weapons, nor was he certain they were contraband. He looked in the paper bag and found cocaine. The district court determined, and Second Circuit agreed, that the officer's actions were within the limits established by the Supreme Court in *Dickerson*. The court reasoned:

> Probable cause to believe an object is contraband must arise while an officer is conducting a permissible patdown search. As noted, probable cause to believe that contraband was present arose when Sergeant Mason, acting within the bounds of a protective patdown search, grabbed the object in Rogers' pocket, manipulated it for a few seconds, and concluded that it was probably drugs. The incriminating character of the object was therefore 'immediately apparent.'

*Id*. at 80. As in this case, the officer in *Rogers* concluded within several seconds that the item was contraband. More notably, the officer in *Rogers* was not absolutely certain that the item was contraband, yet the court found that his conclusion was sufficient to establish probable cause.

In *United States v. Yamba*, the defendant argued that his Fourth Amendment rights were violated when, during a pat-down, the police officer reached into his pocket and seized a plastic bag of marijuana. 407 F. Supp 2d at 710. The district court disagreed and denied the defendant's motion to suppress, reasoning that because the pat-down was lawful under *Terry v. Ohio*, and the plain touch or feel exception applied, the seizure was lawful. *Id*. at 710-15. The Third Circuit affirmed. *See* 506 F.3d at 253. In holding that the seizure was lawful, the district court explained that during the pat-down, "it became immediately apparent to [the officer] that the plastic bag he touched contained a substance that, from his knowledge, training, and experience, he 'knew' to be marijuana." 407 F. Supp 2d at 711; *see also id*. at 715 ("In the course of a protective patdown of Yamba, Livingstone felt something which he immediately recognized as contraband. At that point, it was not merely permissible, but proper for him to remove and inspect further the plastic bag that he 'knew' contained marijuana."). *See also United States v. Walker*, 181 F.3d 774, 779-80 (6th Cir. 1999) (upholding the seizure of a plastic bag from suspect's buttocks area when the officer frisking him felt a bulge in the sea of the suspect's pants that he immediately recognized as crack cocaine based on his six years of experience as a narcotics officer); *United States v. Ashley*, 37 F.3d 678, 679, 681 (D.C. Cir. 1994) (upholding a search that led to discovery of crack cocaine in

suspect's underwear, where suspect consented to be searched and officer's training and experience enabled him to immediately recognize crack).

Based on the foregoing cases, the Court concludes that Perry had probable cause to arrest Hill after feeling the object under his pants that he suspected to be illegal narcotics. Two things support the Court's conclusion. First, because this was not a *Terry* search performed for officer safety but rather a consent search to look for contraband, the pat down had a wider scope than a typical *Terry* searches described in these cases. This means that Perry had more leeway to feel the object under Hill's pants to determine if it was illegal. Second, as a DEA agent doing drug interdiction work for over 22 years, Perry was able to recognize almost immediately that the package under Perry's pants had a crunchy feeling that was consistent with crystal methamphetamine. The evidence suggests that Perry did not linger over the object, rolling it between his fingers for a sustained period of time. Rather, he felt and identified it quickly. Thus, even if the pat down had been conducted pursuant to *Terry*, the search still would have been within the plain touch doctrine. As described above, in order to arrest Hill and perform a more thorough search, Perry did not need to be absolutely certain that the package contained illegal narcotics; he merely needed to have reached that conclusion based on his training and experience. That is what occurred in this case.

Accordingly, the Court concludes that Perry had probable cause to arrest Hill.

## IV.   Search Incident to Lawful Arrest

Finally, Hill contends that because Perry lacked probable cause to arrest him, the agents' act of unzipping his jeans and removing objects from his pockets was not a search incident to a lawful arrest. However, the foregoing conclusions forestall that argument. Hill gave valid consent to the pat down search, Perry did have probable cause to arrest, Hill's arrest was lawful, and

therefore the second, more thorough search of his person was a lawful search incident to arrest. The subsequent discovery of the drugs and the gun, along with Hill's incriminating statements— all a result of the search incident to arrest—should not be suppressed.

IT IS THEREFORE ORDERED that *Defendant's Motion to Suppress Statements and Physical Evidence* [Doc. 36] is DENIED.

_____

**UNITED STATES DISTRICT JUDGE**